Filed 10/1/20  B.W. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| B.W., | |
| Petitioner, | G059198 |
| v. | (Super. Ct. No. 19DP0101) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Debra L. Losnick, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Petition denied.

Law Office of Stefanie N. West and Stefanie N. West for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Yana Kennedy for the Minor.

\* \* \*

**INTRODUCTION**

B.W. (Mother) is the mother of C.W. (the Child), who was taken into protective custody in January 2019 at age six.  Mother's petition for writ of mandate seeks relief from the juvenile court's order, made at the 12-month review hearing, terminating reunification services and setting a hearing pursuant to Welfare and Institutions Code section 366.26 (further code references are to the Welfare and Institutions Code unless otherwise noted).  The section 366.26 hearing is set for October 20, 2020.

We conclude:  (1) Substantial evidence supports the juvenile court's finding that the return of the Child to Mother's care would create a substantial risk of detriment to the Child's safety, protection, or physical or emotional well-being; (2) the juvenile court did not err by declining to continue dependency proceedings beyond the 12-month review hearing; and (3) substantial evidence supports the juvenile court's finding that reasonable services were provided or offered to Mother.  We therefore deny Mother's petition for writ of mandate.

**FACTS**

**I.  Detention, Jurisdiction, and Disposition**

The Child was taken into protective custody on January 24, 2019 upon execution of a protective custody warrant.  The warrant was the culmination of an investigation into reports and concerns that Mother and her live-in boyfriend, C.P., had engaged in domestic violence in front of the Child, C.P. had abused substances in front of the Child, and C.P. had twice been arrested for domestic violence and had a criminal history.  Mother and C.P. had recently moved to California from Pennsylvania.

The Child's father had died before the Child was born, and the paternal grandmother, who lives in Pennsylvania, obtained partial physical custody of the Child

2

through a Pennsylvania family law court.  In February 2019, paternal grandmother was granted de facto parent status.

The detention report related an incident occurring on January 1, 2019 in which C.P. became angry with Mother for refusing sexual intercourse with him.  C.P. threw things on the floor, broke the television set, and, grabbing Mother by both arms, pushed her into a sliding glass door, a closet door, and a bedroom wall.  He then shoved Mother to the ground, picked her up, and used her hand to punch himself in the face.  The Child watched the incident and was visibly shaken and traumatized by it.  Mother continued to allow C.P. to have contact with the Child after the incident.

The Huntington Beach Police Department call log had a number of reports received in November and December 2018 of screaming and fighting coming from Mother and C.P.'s apartment.  In November 2018, C.P. was arrested for domestic violence after beating Mother, and she obtained an emergency protective order against him.

The detention report noted that Mother had been arrested in Pennsylvania in 2017 for assault and harassment against C.P. and disorderly conduct.  The report also mentioned that Mother might have unresolved mental health and substance abuse issues; paternal grandmother had reported that Mother had a history of using methamphetamine and marijuana.

The juvenile dependency petition, filed on January 28, 2019, alleged failure to protect under section 300, subdivision (b)(1) based on allegations that:  (1) the Child had been exposed to domestic violence between Mother and C.P.; (2) there had been a history of domestic violence between Mother and C.P. in Pennsylvania; (3) Mother had exposed the Child to an unsafe living environment in that C.P. had been found in possession of methamphetamine; (4) Mother had a criminal history of arrests and convictions in Pennsylvania; (5) Mother may have an unresolved substance abuse

3

problem; and (6) Mother may have undiagnosed and untreated mental health issues. The Child, who had been placed in a foster home, was ordered detained.

Orange County Social Services Agency (SSA) proposed a case plan in which Mother would participate in and complete (1) a domestic violence program, (2) a parenting education program, (3) a substance abuse outpatient program, and (4) substance abuse testing. In the weeks following the detention hearing, the assigned social worker encountered difficulties in getting Mother to meet with her and review the case plan.

Mother pleaded nolo contendere at the jurisdictional hearing on April 9, 2019. The juvenile court found the allegations of the dependency petition, as amended by interlineation, to be true by a preponderance of the evidence. The court ordered Mother to "patch test" for drugs.

In the meantime, the juvenile court communicated with its counterpart in Bucks County, Pennsylvania in accordance with the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.). The two courts concluded that Pennsylvania did not have exclusive, continuing jurisdiction. In April 2019, sometime after the jurisdictional hearing and before the dispositional hearing, the Family Division of the Court of Common Pleas of Bucks County, Pennsylvania, issued an order granting paternal grandmother temporary sole legal and physical custody of the Child conditioned on the juvenile court finding such custody was in the Child's best temporary interests.

At the dispositional hearing on April 22, 2019, the juvenile court ordered the Child declared a dependent child under section 360, subdivision (d). The court ordered reunification services and visitation according to SSA's proposed case plan.

## II. Paternal Grandmother's Section 388 Petition

In May 2019, paternal grandmother's home was approved for placement. SSA did not recommend placing the Child in paternal grandmother's home because SSA believed moving the Child to Pennsylvania would interfere with Mother's participation in

4

reunification services. As a consequence, paternal grandmother brought a petition under section 388 asking the juvenile court to place the Child with her.

An evidentiary hearing on the section 388 petition was conducted in August 2019. Before the hearing, SSA changed its position and recommended placing the Child with paternal grandmother.

Mother's testimony at the hearing on paternal grandmother's section 388 petition is relevant to the issues of Mother's compliance with the case plan and insight into the circumstances leading to dependency proceedings. Mother testified she had participated in a parenting program but had not started a domestic violence program and was not even enrolled in a drug treatment program. She claimed she was unaware of or confused about the components of her case plan, and was unaware she had to participate in a substance abuse program.

Mother claimed to have had some unspecified difficulty in obtaining a patch for drug testing; she also denied having any history of drug abuse. Mother denied having unresolved mental health issues, although she did acknowledge having been diagnosed with attention deficit disorder and anxiety. Mother testified that, since February 2019, she had had no contact with C.P., who had moved back to Pennsylvania. Mother objected to placing the Child with paternal grandmother because that would disrupt Mother's ability to visit and reunify with him.

Mother testified that while she and the Child were living with C.P. in Pennsylvania from March through May 2017, there had been one incident of domestic violence, the Child had been present during the incident, and C.P. was arrested for domestic violence. A protective order against C.P. had been issued as of the time of the incident on January 1, 2019. Mother initially testified that C.P. had entered her apartment uninvited that day in violation of the protective order, but later testified that she and C.P. were in the apartment together to prepare to move out. Mother denied any incidents of domestic violence with C.P. other than one in April 2017 in Pennsylvania and the one on

5

January 1, 2019 in California. Mother knew that C.P. had been arrested for methamphetamine possession in November 2018.

The juvenile court granted the section 388 petition and ordered placement of the Child with paternal grandmother. The court made comments and findings on the record, several of which bear upon the issues presented here. The court, referring to an SSA report, noted that on July 18 Mother had become upset with the social worker during a telephone conversation, and, on the same day, C.P. had left threatening telephone messages with two social workers. The court described the messages as "a diatribe" and "telling and graphic." From the timing of the messages, the court found there was circumstantial evidence that Mother had communicated with C.P., "which would cause a great deal of concern." The court commented on the inconsistency in Mother's testimony on why C.P. was in her apartment on January 1, 2019, disbelieved Mother's testimony, and found that that Mother "willfully testified inaccurately in that particular."

The court ordered physical visits between Mother and the Child to continue, either by Mother traveling to Pennsylvania or the Child traveling to California, and instructed SSA to facilitate these visits. Funding for Mother's airfare to Pennsylvania to visit the Child was contingent on Mother being in full compliance with her case plan.

### III. Mother's Progress to the Six-month Review Hearing

SSA prepared a status review report describing Mother's progress from the date of the detention hearing to October 21, 2019, the date of the six month review hearing.

As part of her case plan, Mother was required to participate in and complete a domestic violence program, a parenting education program, a substance abuse outpatient program, and substance abuse testing. Mother completed the parenting education program in August 2019. As of October 21, 2019, Mother had not participated

6

in a substance abuse outpatient program.  Mother had failed to make an intake appointment for a domestic violence program.  She claimed she could not make an appointment without a referral; the social worker confirmed that was not true.

Mother had not complied with the substance abuse testing component of the case plan.  She was reported as having zero compliance with her randomized drug testing and had 10 no show results in August and September 2019.  Mother was required to have patch testing, but as of October 21, 2019 had not had a patch applied and had not contacted the patch testing service.  The patch testing service had tried to contact Mother but received no response.

In August 2019, counseling was added to Mother's case plan.  At the end of September, the social worker gave Mother a packet of counseling resource materials.  As of October 21, Mother had not provided verification of enrollment in a counseling program.

Mother visited the Child via Skype, and the visits were "positive and appropriate."  Personal visits could not be arranged because of Mother's failure to communicate with the social worker.

According to the status report, Mother had not been in contact with the social worker since August 21, 2019 and had not responded to the social worker's telephone calls, text messages, or e-mails.  Thus, "barriers in completing case plan services" could not be addressed.

The juvenile court found that Mother's progress toward reunification with the Child was "minimal."  The court ordered continuation of reunification services and scheduled a 12-month review hearing for March 2020.

### IV.  Mother's Progress from the Six-month Review Hearing to the 12-month Review Hearing

The date of the 12-month review hearing was affected by emergency orders issued in response to the COVID-19 pandemic and was not conducted until June 2020.

7

From the date of the six-month hearing to June 30, 2020, Mother made the following progress:

A.  *Substance Abuse Treatment*

In December 2019, Mother was referred for enrollment in the Orange County Healthcare Agency (HCA) substance abuse program.  On December 16, Mother attended a brief intake screening, during which she denied having used drugs.  She did not show up for an appointment with a clinician on December 30.  Mother delayed participating in a substance abuse program and did not enroll in one until April 2020.  Her counselor was aware of only one positive methamphetamine test.  Mother continued to deny having a substance abuse problem.

Mother struggled with finding stable housing, but in May 2020 began living in Collette's Children's Home (Collette's) sober living program.  Mother's manager there, Lacy Morek, reported that Mother appeared to be doing well and was aware of the requirements that she remain sober, participate in drug testing at Collette's, and find employment within 30 days.

B.  *Drug Testing*

1.  *Patch Testing*

To comply with the patch testing requirement, Mother was to have a new patch applied every 7 to 10 weeks (later changed to every two weeks).  Mother had her first patch applied on October 21, 2019.  Since that date, five patches, including a patch collected in May 2020, have tested positive for methamphetamine.  She returned four patches late; only one of these could be tested, and it was one of the five that tested positive for methamphetamine.  One patch was never returned.  Four patches had become detached from the skin and could not be tested.  The other patches tested negative for methamphetamine.  There were two one-month gaps in patch testing.  Mother had a patch applied on October 21, 2019 but as of November 20 had not returned to have it removed.

8

Mother had a patch applied on February 25, 2020 and did not return to have it removed until March 27.

Mother continued to deny using drugs and made several excuses for her positive tests. She claimed the positive tests were due to living in a hotel with drug users. The social worker told Mother environmental factors would not affect patch testing results. Mother claimed her patch test results had been switched with those of another person with her name. The patch testing service provider confirmed it had another client with Mother's name who was participating in patch testing, but this person did not have the same date of birth as Mother. The testing facility provided the social worker with proof of the chain of custody of Mother's returned patches and explained that the testing laboratory asks for name, date of birth, and identification from the client, and that patches are identified by a bar code matching the client's file.

Mother also claimed the positive patch tests were due to Adderall that she had been taking since childhood. The patch test service provider, Resource Management and Development (RDM), informed the social worker that Adderall could lead to a positive test for amphetamine, but not for methamphetamine. The social worker provided RDM with a list of prescription and nonprescription medications that Mother claimed to be taking; RDM confirmed that none of them would cause a positive test for methamphetamine.

To address Mother's concerns about patch testing, the social worker provided Mother a list of other testing facilities and recommended that Mother change her patch test service provider. Mother declined to change patch test service providers because, she said, the other providers were out of her way.

2. *Random Testing*

Mother was required to have random drug testing, but as of November 2019 had a zero percent compliance rate. Between December 10, 2019 and June 5, 2020,

9

Mother missed 13 random tests and had five dilute tests.  The remaining tests were negative.

The social worker contacted RDM to ask why Mother's random drug test results were negative for methamphetamine while Mother's patch test results for the same period of time were positive.  The social worker was informed it was possible to have a positive patch test and a negative urine test because a patch "presents a much longer detection window" and has different screening levels than urine does.

In May 2020 Mother, on her own volition, completed a hair follicle test for illicit substances, including methamphetamine.  The test was negative.  The social worker contacted RDM to ask why the patch test would be positive for methamphetamine and the hair follicle test would be negative.  In response, she was referred to court opinions in which hair follicle testing was found to be less reliable than patch testing.

In June 2020, Mother sent the social worker the results of blood screen tests that Mother had undertaken voluntarily.  The tests screened for nine substances, including methamphetamine:  The tests were negative for all substances.  The printed test results cautioned that "[t]he absence of expected drug(s) and/or drug metabolites may indicate non-compliance, inappropriate timing of specimen collection relative to drug administration, poor drug absorption, or limitations of testing," and that the test results were "not valid for forensic use."

C. *Counseling*

Mother started counseling in January 2020.  Mother told her therapist, Ariana Day Meyer, that she was not having any communication with C.P. and her recent in-person visit with the Child had gone well.  Meyer reported that Mother understood and acknowledged SSA's involvement, "accept[ed] her role in the consequences," appeared "motivated toward reunification," and was "cooperative and receptive."  Mother had adamantly denied any history of substance abuse, and the therapist saw no signs that Mother abused substances.

10

In May 2020, Meyer told the social worker that Mother had consistently participated in counseling and was making progress toward her goals of staying sober, addressing domestic violence, and learning "positive parenting." Meyer was aware of only one of Mother's positive tests for methamphetamine and told the social worker that Mother continued to deny any drug use.

D. *Domestic Violence Program*

Mother enrolled in a domestic violence program in January 2020. On the intake form, Mother did not identify herself as a victim of domestic violence. On May 20, 2020, Mother reported to SSA that she was continuing to participate in the domestic violence program by Zoom video chat, enjoying the program, and learning about how to prevent domestic violence and its effects on children. The program facilitator expressed no concerns about Mother and reported that she was attending her classes and doing well.

E. *Placement and Visitation*

The Child continued to be placed with paternal grandmother in Pennsylvania. He appeared to be thriving in her care: His medical, developmental, and mental health needs were being met, and he was reported to be making "tremendous growth" in school.

Mother was generally consistent with her Skype visits with the Child, and the visits were, for the most part, appropriate. During visits, the Child would read to Mother and they played online games together. Mother felt she had a bond with the Child. When the social worker asked the Child how the Skype visits with Mother were going, he replied, "good," without elaboration.

On December 9, 2019, the juvenile court ordered SSA to arrange for Mother to visit the Child over Christmas. SSA informed Mother that, due to the short notice given by the court, SSA did not have enough time to obtain funding for travel costs up front but would be able to reimburse her for them. Funding problems for travel

11

costs also arose in January 2020.  Due to lack of funding, Mother was not able to visit the Child in person in December 2019 and January 2020.

Mother traveled to Pennsylvania in February and March 2020 to visit the Child.  The visits generally went well; the Pennsylvania social worker had no "blatant concerns," saw no "inappropriate interactions," and concluded the visits were generally positive.  After the March 2020 visit, visits between Mother and the Child were limited to Skype due to the Covid-19 pandemic.

In June 2020, paternal grandmother reported to the social worker some comments made by the Child that were of concern.  The Child, while in bed and playing a game on an i-Pad, said, "the second thing she did, I don't think you're going to like. You know what she did?  She made the closet door fall on [C.P.,] she should be in more trouble."  The paternal grandmother told the Child he was safe now.  The paternal grandmother had video recorded the Child making the comments and sent the recording to the social worker, who, after watching the recording, concluded the Child had not been coached.  The paternal grandmother arranged trauma-focused therapy for the Child.

F.  *Possible Contact with C.P.*

Evidence surfaced that Mother might have had contact with C.P. in February 2020 while she was in Pennsylvania to visit the Child.  On Christmas Day, 2019, C.P. went to paternal grandmother's home to visit the Child and give him gifts that were packed in a piece of children's luggage.  When C.P. knocked on the front door, he was asked to leave and law enforcement was summoned.  A photographic image showed C.P. carrying a piece of children's luggage.  On February 24, 2020, the Pennsylvania social worker reported that during an in-person meeting Mother had given the Child a piece of luggage that appeared to be the same luggage that C.P. was carrying on December 25, 2019.

## V. 12-month Review Hearing

The 12-month review hearing was conducted over several days in June 2020 and concluded on June 30. Meyer, Teresa Fern,[1] Morek, social worker Jeannette Chavarria, and Mother testified at the hearing.

A. *Meyer's Testimony*

Meyer, a licensed marriage and family therapist, had been counseling Mother since January 2020. Mother's goals in therapy were stress management, domestic violence and substance abuse education, gaining insight into those matters, improving parenting skills, and "just processing her emotions about being separated from her son." Mother was actively participating in therapy sessions and making progress toward achieving her goals.

Mother had told Meyer about only one positive drug patch test result. Other than the one positive patch test result, Meyer had not been told about other positive test results, late returns, patches falling off, and time gaps in testing. Mother had adamantly insisted she did not know how she could have had a positive patch test result. Mother disclosed that, in the past, she had undergone treatment for drug abuse, with methamphetamine being her drug of choice, but denied having a substance abuse problem. Mother had said she had not used methamphetamine for over a year, and she never appeared to be on methamphetamine.[2] Meyer believed Mother was being truthful.

Mother had told Meyer that visits with the Child had been going smoothly and that Mother and the Child were "close," have "good communication," and "relate well to each other."

---

[1] Fern testified she collected the hair follicle specimen from Mother and the proper chain of custody protocols were followed for the test. Fern was not aware of the test results.

[2] Later in her testimony, Meyer testified that Mother never said she had used methamphetamine; instead, Meyer testified that Mother had a substance abuse problem in that she had been involved with someone (C.P.) who used methamphetamine.

On the subject of domestic violence, Meyer had been told by Mother that C.P. had been "abusive" in the past but she had had no contact with him since moving to California. Meyer's understanding was the domestic violence between Mother and C.P. had been verbal and emotional abuse only: Meyer could not recall if Mother had ever mentioned physical abuse. Mother had never mentioned that the Child was present during the incidents of domestic violence.

Meyer had been told by Mother that the Child was removed from her care because of "the incident" with C.P. Meyer could not recall, however, what the incident was or whether Mother had given any other reasons for the Child's removal. Meyer was not aware that Mother had any mental health issues. Meyer believed that Mother would benefit from more therapy sessions.

B. *Morek's Testimony*

Morek is Mother's case manager at Collette's, a homeless shelter for women and children. Morek first met Mother at an eligibility interview on May 11, 2020.

Mother was doing well and progressing at Collette's. Collette's has a "zero tolerance" for drugs and alcohol and requires residents to find employment within 30 days. Collette's conducts onsite drug testing of its residents. From May 11 through June 5, 2020, Mother had been tested eight times at Collette's. Two of tests were the previously mentioned hair follicle test and blood screen; the rest were urine tests. All the test results for Mother were negative for drugs.

Morek testified that at Collette's the urine sample is taken in a manner that would make cheating difficult and the sample is usually tested on the spot with a test strip built into the sample cup. The test only gives a positive or negative result and does not give a specific level. Morek did not know cutoff levels, i.e., the level of a substance that will produce a positive test. Urine samples are sent to a laboratory for analysis only if there is some indication the person providing the sample has been using drugs or alcohol.

14

Mother had never appeared to be using methamphetamine and denied ever using it. Morek believed Mother to be credible. Although Mother's urine specimens collected at Collette's did not appear suspicious so as to require testing at a laboratory, Morek did send one urine specimen to an outside laboratory for analysis. The tests results were negative, but the laboratory had not tested for methamphetamine.

Morek was told by Mother that the Child had been taken from her care for failure to protect him from domestic violence. Mother said that drugs were involved, but only as to C.P.

C. *Chavarria's Testimony*

Chavarria is a social worker and was assigned to Mother's case in May 2019. At that time, she had been a social worker for a year; this was her first case.

Chavarria reiterated or confirmed information presented in the SSA reports received into evidence.[3] She testified that Mother was in compliance with all aspects of her case plan except for drug testing. Each of the providers of Mother's case plan services had told Chavarria that Mother had been making progress, was on time for appointments and respectful, and meaningfully participated in services.

Although Mother was participating in services, Chavarria believed that Mother had not demonstrated "any changes in behavior that would show she's become insightful and that she would be protective of her child." In support of her belief, Chavarria referred to Mother's positive tests for methamphetamine, inconsistency in drug testing, and lack of insight into the reasons for the dependency proceedings and how she would protect the Child. Mother had told Chavarria that it was "unfair" that Mother had

---

[3] The court received into evidence the following SSA reports: (1) Status Review Report dated October 21, 2019; (2) Interim Review Report dated December 9, 2019; (3) Status Review Report dated March 23, 2020; (4) Addendum Report date April 28, 2020; (5) Addendum Report dated June 2, 2020; and (6) Addendum Report dated June 17, 2020.

15

to complete services and that SSA had removed the Child. In addition, Mother had been dishonest at various times.

Chavarria had contacted the case worker for the person with Mother's name who had been patch testing at the same facility. That case worker confirmed that the person having Mother's name had reported no difficulties with drug patch testing.

D. *Mother's Testimony*

Mother testified she had completed her parenting and domestic violence programs and was willing to continue in counseling and participate in outpatient treatment program. She denied having a substance abuse problem and denied taking any medications except for using an inhaler for asthma. She had, in the past, participated in "detox" program because she was physically addicted to Xanax.

Mother testified the only reason for the Child's removal from her care was the incident in January 2019 when C.P. "broke into the house" and the Child watched C.P. and her argue. That incident was, according to Mother, the only time the Child was not safe in her care. Mother later acknowledged there had been two other incidents of domestic violence: one resulting in her arrest in 2017 for assaulting C.P. and another leading to the issuance of the protective order against C.P. in November 2018. Mother denied having had contact with C.P. since January 2019 and claimed she had retrieved from a storage unit the luggage given to the Child in February 2020.

Mother testified that she had notified her social worker about issues related to her drug testing, concerns about the drug patch falling off, and claims of mistaken identity. Mother had not been willing to change test facilities due to distance. Mother did not know how she could have patch tested positive for methamphetamine: She maintained her belief the patch testing was inaccurate. She had hair follicle and blood tests conducted at her own expense to prove she had not been using. Mother could not explain the missing urine tests or why she missed patch testing for the two one-month

16

periods. She attributed her diluted urine specimen tests to a kidney infection requiring her to increase the amount of water she drank.

Mother was living at Collette's, which provided her stable housing and support, and enabled her to participate more easily in case plan services. She had been having struggles with transportation and housing which, along with the COVID-19 pandemic, increased her difficulty in participating in services. Mother acknowledged having received bus passes months before the COVID-19 outbreak and conceded she had not always made herself available to Chavarria.

Mother testified that her in-person visits with the Child were positive and she was working successfully with paternal grandmother to schedule Skype visits. Mother testified she was in compliance with her case plan in December 2019 and January 2020, even though she had not yet enrolled in outpatient substance abuse treatment, and therefore, SSA should have funded her travel to visit the Child.

Mother agreed she had been having a difficult time with transportation, housing, and case plan compliance. She had been struggling to take care of herself and now was "really trying" to turn things around. She believed that Collette's would provide the Child a stable and safe environment.

E. *The Juvenile Court's Ruling*

The juvenile court began it rulings by reviewing witness testimony and making credibility determinations. The court did not give much weight to Meyer's testimony because Meyer did not know all the reasons for Mother being in therapy, did not know about Mother's positive test results, did not know the Child had special needs, was not aware of all the reasons for the Child being removed from Mother's care, and was not informed that Mother had been involved in physical domestic violence. The court found that Morek did not help the court or Mother "in any way" and had no confidence in her testimony. The court made note of Chavarria's testimony that Mother

17

was not in compliance with her case plan, lacked insight, and had been reluctant to answer Chavarria's questions.

The court found Mother was not a credible witness, her claims of mistaken identity were "not plausible," and none of the patch test results was "mixed up in any way." The court found that Mother had played "fast and loose" with drug testing both before and after the COVID-19 outbreak, did not "have any explanation to satisfy [the] court as to why the patches were positive [and] why the dilute [tests] were positive," and continued to claim, wrongly, that the Child had been removed based on domestic violence only.

The court found that Mother was not in compliance with her case plan and, although Mother had participated in counseling and other services, she had not demonstrated that she benefitted and learned from them: "All I see is [Mother] continuing to deny why she's in court and why she has positive tests, none of which make[s] sense to me and none of which, frankly, I believe."

The court concluded by finding: (1) return of the Child to Mother's care would create a substantial risk of detriment to the Child's safety, protection, or physical or emotional well-being; (2) Mother's progress was "minimal, given her denial as to why she's here and why this case was filed in the first place"; and (3) "above and beyond" reasonable services were offered or provided. The court ordered reunification services terminated, and a hearing pursuant to section 366.26 was scheduled.

## DISCUSSION

### I. Substantial Evidence Supports the Juvenile Court's Risk of Detriment Finding.

Mother contends substantial evidence does not support the trial court's finding that returning the Child to her custody would create a substantial risk of detriment. At a 12-month review hearing, the juvenile court must return a child to

18

parental custody "unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) A parent's failure to participate regularly and make substantial progress in court-ordered treatment programs is prima facie evidence that return of the child to the parent's care would be detrimental. (§ 321.21, subd. (f)(1)(B).)

At the 12-month review hearing, the focus is the child's well-being at the time of the hearing rather than on the initial basis for juvenile court intervention. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.) "Thus, while the court must consider the extent the parent has cooperated with the services provided and the efforts the parent has made to correct the problems which gave rise to the dependency [citation], the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*Ibid.*)

We review the juvenile court's factual findings, such as the finding of risk of detriment, under the substantial evidence standard. (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345-1346; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.) "Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 865 (*Georgeanne G.*).) The juvenile court assesses the credibility of witnesses, and we are bound by its credibility determinations. (*In re S.P.* (2020) 53 Cal.App.5th 13, 18-19; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.)

Mother argues substantial evidence does not support the court's finding of risk of detriment because she had completed her parenting class and domestic violence program, was participating in counseling and outpatient substance abuse therapy, and was in full compliance with drug testing except for the positive patch tests, which she contested. Mother's Skype and in-person visits with the Child were positive and appropriate, and no visit had been terminated.

It is true that Mother had complied with several components of her case plan and was attending counseling, and her visits with the Child were positive and appropriate. But the problems on which the juvenile court rested its decision were that Mother had not complied with the drug testing component of her case plan and, although she had participated in counseling and other services, she had not benefitted and learned from them, and lacked insight into the reasons for the Child's removal from her care. Mother had not made substantive progress in her treatment program. Substantial evidence supports the court's findings.

Mother was not in compliance with the drug testing component of her case plan. Mother had five patches test positive for methamphetamine. Mother had all sorts of excuses for the positive tests, each of which the social worker, after investigation, was able to refute. Mother stuck by the excuse of the switched tests right up through the 12-month review hearing. The juvenile court did not believe Mother and did not believe any test results had been mixed up. We accept these credibility determinations and resolutions of conflicts in the evidence.

In addition to the five positive patch tests, there were two one-month gaps in testing and several patches that had become detached and could not be tested. Mother missed 13 random drug tests and had four dilute tests between December 2019 and June 2020. Missed tests, without adequate justification, are considered to be positive results. (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1384.) Mother had a negative blood test and a negative hair follicle test, but she chose when to have those tests conducted. From

20

the evidence, the trial court drew the reasonable inference that Mother played "fast and loose" with drug testing.

Mother's compliance with some components of her case plan is not necessarily enough in itself to justify returning the Child to her care. The question is whether Mother made substantive progress. In that regard, a juvenile court may consider a parent's lack of insight into reasons for the child's removal and failure to learn from reunification services. (*Georgeanne G., supra,* 53 Cal.App.5th at pp. 859, 865-867.) "'[S]imply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative. The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated.'" (*Id*. at p. 867) A juvenile court may consider a social worker's opinion that a parent lacks insight if the opinion is based on evidence. (*Ibid*.)

Chavarria, the social worker, testified to her opinion that Mother lacked insight into the issues prompting the Child's removal from her care. Chavarria's opinion was based on evidence. Mother's persistent denial of ever having used methamphetamine demonstrates that Mother never gained an understanding of, or was blind to, the reasons why the Child had been removed from her care. Despite the positive patch tests, the missed random tests, and the dilute tests, Mother continually denied ever having a substance abuse problem or ever using methamphetamine. At the hearing on paternal grandmother's section 388 petition, Mother denied any history of substance abuse. Mother made the same denial to the social worker, to her counselor, at the intake screening for outpatient substance abuse treatment, and in her testimony at the 12-month review hearing. From the evidence, the juvenile court could have found that Mother's adamancy indicated either her sincerity or her failure (or refusal) to make progress in meeting the objectives of her case plan. The court chose the latter: the court found that

21

Mother was not a credible witness and her denials demonstrated she lacked insight into the reasons why the Child had been removed from her care.

Mother also lacked insight into the domestic violence that was another reason for the Child's removal from her care. She testified the only reason why the Child had been removed was the single incident of domestic violence in January 2019—and she denied that incident had been violent. C.P. was with Mother on January 1, 2019 notwithstanding the protective order against him. Mother had two different and conflicting stories for why C.P. was in her home that day: He broke in uninvited, or he was there to help her move. Paternal grandmother video recorded the Child recall, without prompting, that he had watched Mother make a closet fall on C.P. Yet Mother testified she and C.P. had only argued. Only on cross-examination did Mother acknowledge the incident in November 2018 when C.P. attacked her and threw her around. That incident prompted Mother to get the protective order against C.P., which Mother allowed C.P. to violate.

Mother denied having had any contact with C.P. since January 2019 and claimed the luggage she gave to the Child came from a storage unit. The court did not believe her. The juvenile court was justified in concluding that Mother obtained the luggage from C.P.

Mother's lack of insight impaired her ability to learn and benefit from reunification services. Lack of insight meant that Mother was not completely honest or forthcoming with Meyer. The court reviewed Meyer's testimony and found that Mother had not informed Meyer of all the reasons leading to the Child's removal: Meyer did not know about Mother's positive drug test results and the extent and nature of Mother and C.P.'s history of physical domestic violence, including Mother's role as aggressor. Meyer was not told about the incident of domestic violence in November 2018 or the protective order and was led by Mother to believe the violence was entirely emotional. Unless Meyer were accurately and thoroughly informed of the reasons why Mother was

22

in therapy and why the Child was removed from her care, it is unlikely that Mother would make progress in therapy to correct the problems leading to the dependency proceedings.

By attending therapy sessions, Mother might have been in technical compliance with her case plan, but as the juvenile court found, Mother had to demonstrate that she was learning from therapy and gaining an understanding of why the Child is in the dependency system. "All I see," the juvenile court stated, "is [Mother] continuing to deny why she's in court and why she has positive tests."

## II. Continuation of Dependency Proceedings Beyond the 12-month Review Hearing Would Have Been Unwarranted.

Mother argues the juvenile court erred by not continuing the dependency case to the 18-month point because she had made significant progress in her case plan, she consistently attended visits with the Child, she had found stable housing, and her positive patch tests were in error.

A dependency case may be continued beyond 12 months, but to a date no later than 18 months after a child was removed from a parent's physical custody. (§ 366.21, subd. (g)(1).) A juvenile court may continue dependency proceedings only if it finds "there is a substantial probability that the child will be returned to the physical custody of his or her parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (*Ibid.*) "[I]n order to find a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time, the court shall be required to find all of the following: [¶] (A) That the parent . . . has consistently and regularly contacted and visited with the child. [¶] (B) That the parent . . . has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent . . . has demonstrated the capacity and ability both to complete the objectives of

his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g)(1)(A)–(C).)

To warrant continuation of a dependency proceeding beyond the 12-month review hearing, "there must exist more than just mere hope additional services will facilitate reunification," and the juvenile court must "essentially determine if the parent has demonstrated sufficient rehabilitation to complete the program plan in the extended time, as well as the ability to once more adequately provide for a child's emotional and physical well-being." (*A.H. v. Superior Court* (2010) 182 Cal.App.4th 1050, 1060, 1062.) A court's finding of "no reasonable probability of return" is reviewed under the substantial evidence standard. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 681.)

The Child was removed from Mother's care on January 24, 2019; therefore, the 18-month period elapsed within weeks after the juvenile court terminated reunification services on June 30, 2020. Substantial evidence supports a finding there was no reasonable probability that the Child would have been returned to Mother within those few weeks. Although Mother had consistently and regularly contacted and visited the Child, she neither had made significant progress in resolving the problems that led to his removal nor had demonstrated the capacity and ability to complete the objectives of her treatment plan. Even at the 12-month review hearing, Mother denied ever using methamphetamine and continued to press her claim that the positive patch test results were inaccurate—a claim she makes yet again in her petition for writ of mandate. At the 12-month review hearing, Mother expressed her belief that the only basis for the Child's removal was the single incident of domestic violence in January 2019—which she maintained was only an argument.

In other words, as late as 17 months after the Child had been removed from her care, Mother still denied or failed to understand the very reasons for his removal. It

is, therefore, almost certain that Mother would not or could not have completed or made substantial progress in her treatment plan within the next few weeks.

### III.  Substantial Evidence Supports the Juvenile Court's Finding That Reasonable Services Had Been Provided or Offered to Mother.

Mother argues she was not provided or offered reasonable reunification services.  Except under circumstances not applicable here, reasonable reunification services must be offered when a child is removed.  (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)  Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case.  (*Earl L. v. Superior Court*, *supra*, at p. 1501.)

We review under the substantial evidence standard the juvenile court's finding that reasonable services had been provided or offered.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)  We view the evidence in a light most favorable to the juvenile court's order and draw all reasonable inferences to uphold it.  (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.)

Mother contends she was not offered or provided reasonable services in two respects.  First, she contends SSA "fail[ed] to address conflicting drug patch results."  Second, she argues SSA failed to arrange in-person visits with the Child.

Mother's first contention asks us to reweigh the evidence and disregard the juvenile court's credibility determinations.  After considering and weighing the evidence, the court found that Mother was not in compliance with the drug testing component of her case plan and had been provided or offered reasonable services in that regard.  Substantial evidence supports those findings.  The juvenile court heard Mother's testimony, the social worker's testimony, and Morek's testimony.  The court received into evidence the SSA reports, the results of the urine tests conducted at Collette's, and

25

the results of Mother's blood test and hair follicle test. The court considered evidence that Mother had five positive patch test results for methamphetamine, two one-month gaps in testing, four patches returned late, and four patches that had become detached and could not be tested. The court considered evidence that the social worker had investigated each of Mother's reasons for testing positive, had concluded the patch test results were accurate, and yet had given Mother the option to change patch test service providers. The court, which is the sole judge of witness credibility, found that Mother was not a credible witness and found her story about the mixed up test results was not plausible. We shall not disturb those findings.

Mother relies on *Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505, in which the Court of Appeal held that a parent's single positive drug test, when viewed in the context of the entire case, was not substantial evidence that returning the child to the parent's custody would create a substantial risk of detriment. *Rita L.* is different both quantitatively and qualitatively from our case: The evidence supporting termination of reunification services here was far more than a single positive drug test.[4]

Mother's second contention is based on three incidents: (1) paternal grandmother returned the Child late from a trip to Pennsylvania in August 2019, which caused Mother to miss two visits; (2) SSA failed to submit paperwork timely enough for Mother to travel to Pennsylvania in December 2019 to visit the Child; and (3) due to the COVID-19 pandemic Mother has not been able to have an in-person visit with the Child since March 2020.

The short response to all of this is that visitation is not in issue: Termination of reunification services was not based on visitation or Mother's relationship with the Child.

---

[4] Mother also cites a nonpublished opinion. California Rules of Court, rule 8.1115(a) bars both Mother and us from citing or relying on a nonpublished opinion.

None of Mother's specific points about visitation support continuation of services. Paternal grandmother's failure to return the Child on time occurred in August 2019, before the six-month review hearing, and outside the time period relevant to the finding made at the 12-month review hearing that reasonable services had been provided or offered to Mother. Besides, paternal grandmother's failure to return the Child on time does not mean that SSA failed to provide or offer Mother reasonable services.

SSA was not able to fund travel costs for Mother to visit the Child over Christmas in 2019 because the court order authorizing the travel came on such short notice. In addition, funding for Mother's travel costs to visit the Child was contingent on Mother being in full compliance with her case plan. Mother was not in full compliance with her case plan in December 2019.

The COVID-19 pandemic has affected nearly everybody, and it is unfortunate the pandemic has prevented Mother from having personal visits with the Child. The juvenile court found, however, that "[t]his is not a COVID-related case or issue" because Mother had "plenty of time" to engage in services before March 2020.

## DISPOSITION

The petition for writ of mandate is denied. In the interest of justice, this decision shall become final as to this court five days from the date it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A).)


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.